# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

WENDELL E. ROBINSON,

        Plaintiff,

vs.                                               CIV 00-517 KBM/DJS

GLEN A. VINKE, individually and as the
Bernalillo County Chief of Fire and Rescue,
DIANNE BROWN, individually and as
Administrative Manager of the Bernalillo
County Fire and Rescue, and THE BOARD
OF COUNTY COMMISSIONERS OF THE
COUNTY OF BERNALILLO,

        Defendants.

# MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' Motion For Summary Judgment and

Plaintiff's Motion To Strike Defendant's Affidavit In Support Of Motion For Summary Judgment.

*Docs. 31, 35.* Pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b), the parties consented to

have me serve as the presiding judge and enter final judgment. Having reviewed the record,

arguments of the parties, and relevant authorities, I will deny the motion to strike and grant

summary judgment for Defendants on all claims.

## I.  Background

Plaintiff Wendell Robinson ("Robinson") was the sole black male among approximately six

people employed as administrative assistants with the Bernalillo County Fire and Rescue

Department ("Department").  *See Plf. Depo.* at 80, 99.  The record is not clear when he started

this position, but apparently he was employed in that capacity beginning at least in 1998.

In February 1999,  Vinke issued a first notice of suspension followed by termination

notices in March and April 1999.  After a pre-disciplinary hearing, Plaintiff was terminated in

April 1999.  Robinson was unable to file a grievance because his union representative forgot to

file the requisite paperwork on time.  *Id.* at 200-203.  County Manager Juan Vigil denied

Plaintiff's request to file a late grievance.  Robinson filed a complaint with the New Mexico

Human Rights Commission and the EEOC alleging that his termination was based on race,

gender, and retaliation.

After receiving a right to sue letter, he filed this action against the then-Fire Chief

("Vinke"), his supervisor ("Brown") and the Bernalillo Board of County Commissioners

("Board").  Plaintiff also originally named union defendants – the American Federation of State,

County and Municipal Employees, Council 18, Local 2260.  However they were dismissed by

stipulation in June 2000.  *See Doc. 7.*

Plaintiff's Complaint raises five claims for relief:  Count I under Title VII (42 U.S.C. §§

2000e-2, 2000e-3(a)) for gender and race discrimination and retaliation; Count II under 42 U.S.C.

§ 1981, Count III under 42 U.S.C. § 1985(3) and Count IV under 42 U.S.C. § 1983 for racial

discrimination; and Count V under state law for breach of duty of fair representation and

negligence.  *See Doc. 1; Doc. 33*.  Plaintiff acknowledges that he raises no hostile work

environment claim against any Defendant, nor does he make a claim of breach of duty/fair

representation claim against the Defendant County.  *See Doc. 33* at 10-11.  Accordingly, these

aspects of Defendants' motion are denied as moot.

## II.  Standard For Summary Judgment

Summary judgment may be appropriately granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  The Court must "view the evidence and draw any inferences in a light most favorable to the party opposing summary judgment, but that party must identify sufficient evidence" that would justify sending the case to a jury.  *E.g., Williams v. Rice*, 983 F.2d 177, 179 (10th Cir. 1993) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-252 (1986)).

Indeed, summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)(quoting FED. R. CIV. P. 1).  Most importantly in the context of the present case,

> [the] ***adverse party may not rest upon the mere allegations or denials of the [movant's] pleading***, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

*Id.* at 321-23 (emphasis added).  Based on the record before me, I find that Defendants are entitled to judgment as a matter of law on all claims.

## III.  Motion To Strike

Some of the materials submitted in support of Defendants' summary judgment motion are the subject of Plaintiff's separately-filed motion to strike.  Defendants first contend that the

3

motion to strike is untimely because it was filed after the motions deadline.  Such an argument

strikes me as absurd, since it was the materials submitted with the summary judgment motion

which prompted the motion to strike.  Moreover, the arguments for striking certain evidence are

before me in any event since Plaintiff also raised the issues in his response to the motion for

summary judgment.  *See Doc. 33.*

### Authentication Issues

When Defendants originally filed their exhibits to the motion for summary judgment, they

failed to attach an affidavit meeting the requirements of FED. R. CIV. P. 56(e) properly

authenticating the documents.  Plaintiff asks that Exhibits C, D and H be stricken on this basis

alone.  However, "[a]s is true of other material introduced on a summary-judgment motion,

uncertified or otherwise inadmissible documents may be considered by the court if not

challenged."  10A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE &

PROCEDURE § 2722 (3d ed. 1998).

In response to the motion to strike, Defendants submitted with their reply brief a

supplemental sworn affidavit from Elizabeth Clark, Fire Chief for the Fire Department, which

purports to authenticate the challenged exhibits.  To satisfy the dictates of FED. R. CIV. P. 56(e),

this affidavit must be made on personal knowledge, set forth admissible facts and demonstrate that

the affiant is competent to testify.

Exhibit D to Defendants' motion is a brochure from "International Fire Code Institute"

regarding its voluntary certification program.  One of Defendants' grounds for terminating

Plaintiff's employment was that he failed to properly register two fire inspectors to take the

course.  Among other things, the certification brochure describes the types of tests and how to

register.  Plaintiff contends that Defendants have not established the authenticity of the brochure

since it is neither self-authenticating under FED. R. EVID. 902, nor a public record under FED. R.

EVID. 901(7).

Ms. Clark submitted a supplemental affidavit that explains the Department keeps copies of

the brochure and distributes them to its staff.  *Doc. 37,* Exh. A ¶¶ 6-9.  Indeed, Plaintiff testified

that he requested a copy of the brochure to find out the price of the course.  *Plf. Depo.* at 222-

223.  Furthermore, Plaintiff does not contest that the brochure is what it plainly purports to be –

the brochure concerning the certification programs the he personally referred to in the course of

his employment.  I find that Defendants have met their burden in demonstrating its authenticity.

### *Hearsay Objections*

Plaintiff also moves to strike the brochure on the basis that because the Fire Department

did not write it, the brochure is not admissible as a business record under FED. R. EVID. 803(6).

Documents that one organization receives from another organization and uses in the course of its

own business can be admissible under the business records hearsay exception, however.  The key

issue is trustworthiness of the information:

> a person receiving a document from an unaffiliated business could
> not solely by virtue thereof lay a sufficient foundation for the record
> as a business record of the issuing business.  ***A different situation
> exists when the business receiving the information in the regular
> course of business integrates the information received into its
> business' records, relies upon it in its day-to- day operations, and
> surrounding circumstances indicate trustworthiness. Under such
> limited circumstances admissibility through the testimony of the
> receiving custodian or other qualified witness is permitted. . . .***

3 HANDBOOK OF FED. EVID. § 803.6 (5th ed. 2001) (and cases cited therein).[1]  Under the present

circumstances, I find that the brochure admissible as a business record.

 Plaintiff also moves to strike paragraphs 7, 8, 12, 13, and 14 of Ms. Clark's first affidavit,

Exhibit C to Defendants' summary judgment motion as inadmissible hearsay.[2]  Plaintiff maintains

that none of the assertions are based on personal knowledge.  However, Ms. Clark's supplemental

affidavit specifically states that she has "personal knowledge of the statements of fact contained"

in those paragraphs.  *Doc. 37, Exh. A., ¶ 4.*

 In a rather novel argument, Plaintiff also contends that the challenged paragraphs are

hearsay because there "has been no trial or hearing, thus Ms. Clark's statements are 'out of

_____

 [1]  *See also e.g., Saks Int'l, Inc. v. M/V Export Champion,* 817 F.2d 1011 (2nd Cir. 1987) (loading tallies of service company introduced through ship's chief mate who used the service); *United States v. Johnson,* 971 F.2d 562 (10th Cir. 1992) (wire transfer receipts introduced through individual investors rather than bank); *United States v. Hines,* 564 F.2d 925 (10th Cir. 1977) (automobile invoice introduced through owner of vehicle rather than seller), *cert. denied,* 434 U.S. 1022 (1978).

 [2]  These paragraphs provide:

 "7.  Finch and  Ashmore were required to pass the UFC exam within 150 days of coming into the Fire Prevention Bureau or they would not complete probation requirements."

 "8.  Finch and  Ashmore were unable to take the exam on 3/13/99 due to the fact that they were not properly registered by Wendell Robinson."

 "12.  In the past,  Robinson was made aware of the need for each candidate to have a separate check for the fee required to take the exam."

 "13.  Mr Robinson failed to provide the two candidates with separate checks. . . .  Even if Finch and  Ashmore had been registered for the exam, they would not have been able to take the exam, due to  Robinson's failure in not requesting separate checks."

 "14.  Corey Finch and Jim Ashmore were unable to take the exam in Denver, Colorado on March 1999, although they were in Denver for the exam."

court.'"  *Doc. 38* at 4.  However, the Federal Rules of Evidence provide that "Hearsay is not admissible *except as provided by these rules or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress.*"  FED. R. EVID. 802 (emphasis added). As the Advisory Committee Notes to Rule 802 observe, FED. R. CIV. P. 56 specifically provides for such a hearsay exception for facts set forth on personal knowledge in sworn affidavits in summary judgment proceedings.

Thus, Mrs. Clark's statement are not inadmissible simply because she did not make them on the witness stand.  Furthermore, my review of the substance of the assertions in challenged paragraphs reveals that they do not contain inadmissible hearsay.  None contain a  "third party's description of a witnesses' supposed testimony."  *E.g., Adams v. American Guarantee & Liability Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir. 2000).

Plaintiff also moves to strike any hearsay contained in the amended notice of termination submitted as Exhibit H in support of Defendants' motion.  However, the amended notice is relevant to the motion despite the truth of the matters asserted therein.  It provides evidence of an adverse employment action and the employers stated reasons for taking that action.  Therefore, Plaintiff's hearsay challenge is not well taken.

### *Objections to "Conclusionary" Statements*

Plaintiff's final argument that paragraphs 8 and 13 should be stricken as "conclusions" lacks merit.  Rather, these paragraph contain assertion of facts based on Ms. Clark's personal knowledge of the situation.  *Compare Murray v. City of Sapulpa,* 45 F.3d 1417, 1422 (10th Cir. 1995) ("[t]he three affidavits presented to show dissimilar treatment are merely conclusory and do not provide any *factual bases for the inference* that others were treated differently") (emphasis

added).  Although the assertions are offered as support for Defendants' legal argument that

Plaintiff's dismissal was justified, they are not "merely a conclusory, restating the requirements of

the law." *Doren v. Battle Creek Health Sys.,* 187 F.3d 595, 599 (6ᵗʰ Cir. 1999).   For all of the

above reasons, the motion to strike will be denied.

## IV.  Merits of the Summary Judgment Motion

### *Discriminatory Discharge Based On Gender and Race*

I have carefully reviewed all of the materials submitted with the summary judgment

pleadings and find there is no ***direct*** evidence that Plaintiff was terminated based on his gender, his

race or in retaliation for engaging in protected activity.  Because only circumstantial evidence has

been offered, the *McDonnell Douglas* burden-shifting analysis applies and the inquiry is identical

whether the theory of recovery is under Title VII, § 1983 or § 1981.  *E.g., Kendrick v. Penske

Transp. Servs., Inc.*, 220 F.3d 1220, 1225 n. 4 (10ᵗʰ Cir. 2000).  Therefore, Plaintiff must first

show that: (1) he belongs to a protected class; (2) he was qualified for his job; (3) he was

discharged despite his qualifications; and (4) his job was not eliminated after his discharge.  *Id.* at

1229; *see also Perry v. Woodward,* 199 F.3d 1126, 1138 (10ᵗʰ Cir. 1999).

Defendants contend that Robinson has failed to establish the second element required to

raise a presumption of unlawful discrimination because they have come forward with evidence

showing that Robinson failed to competently perform in the position.  However, "[a]t the *prima

facie* stage of the *McDonnell Douglas* analysis, a plaintiff is only required to raise an inference of

discrimination, not dispel the non-discriminatory reasons subsequently proffered by the

defendant."  *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1193 (10ᵗʰ Cir. 2000).  As

the Tenth Circuit has concluded,

8

> a plaintiff may make out a *prima facie* case of discrimination in a
> discharge case by credible evidence that she continued to possess
> the objective qualifications she held when she was hired, or by her
> own testimony that her work was satisfactory, even when disputed
> by her employer, or by evidence that she had held her position for a
> significant period of time.

*MacDonald v. Eastern Wyoming Mental Health Ctr.*, 941 F.2d 1115, 1121 (10th Cir. 1991)

(internal citations omitted).  I find that Plaintiff has sufficiently demonstrated that he held the

objective qualifications for the position.

Because Plaintiff has carried his burden of establishing a *prima facie* case, the burden

shifts to Defendants to "articulate" a legitimate and nondiscriminatory reason for termination.

The final notice of termination characterized Plaintiff's work performance as "inappropriate,

unprofessional, insubordinate, and inconsistent with your obligations as a County employee."

*Exh. H.*  The various notices of suspension and termination leading up to the final notice outline

numerous deficiencies in Robinson's job performance.  *See Exhs. G-J.*

Having proffered legitimate reasons for the dismissal, the burden shifts back to Plaintiff to

show the proffered reasons are pretextual.  *Kendrick,* 220 F.3d at 1126.  One way to show

pretext is by evidence that the stated reasons are false.  Plaintiff believes his termination was

unlawfully motivated because he provided explanations at the pre-termination hearing for the

asserted incidents of inadequate performance.  *See Plf. Depo.* at 111; *Doc. 33* at 10-11.

Plaintiff's explanations, however, do not dispute that most of the events in fact occurred.

Specifically,

> ! Plaintiff was advised that he did not properly coordinate some inspections and not
> rectifying the situation after being told.  He acknowledged that Ms. Clark advised him of
> complaints from business owners concerning coordinating inspections.  Plaintiff explained
> that he only took care of scheduling the "original" date and notifying the owners but that

9

fire inspectors could later change the date. Thus, he "completed" his scheduling task. His testimony indicates that because he "would never know" if a date had changed, he had been doing all that was required of him even though Ms. Clark reminded him in January 1999 to make sure he was calling the owners. He saw the coordination aspect as someone else's responsibility once he scheduled the initial appointment. *See Plf. Depo.* at 255-257.

! Plaintiff was advised of insubordination in his refusal to perform duties he had been assigned in connection with coordinating hearings/complaints with the Metropolitan Court. Apparently, Plaintiff was told by Ms. Clark in early 1999 that he was being assigned the Metropolitan Court liaison responsibilities. He never inquired of Captain Clark what the position entailed, even after he was asked to schedule something. Instead, Plaintiff wrote a memo to Vinke on January 22, 1999 stating, "'At this time, my current workload . . . demands my full attention and all my energy. Therefore, in the best interest of the County . . . I am declining the new responsibility.'" *Id.* at 262-63. In his view, "declining" the position was not the same as 'refusing' to do the job. *Id.* at 263. Through a subsequent grievance proceeding, he learned that all the job entailed was for him to "take the copies that came from Metro Court and put it on the guy's schedule." *Id.* at 264.

! Plaintiff was advised that Brown witnessed him conversing rudely to and hanging up the phone on a coworker. Plaintiff explained that he could not have "hung up" because he uses the speaker phone, but acknowledged that Brown could have witnessed the incident. *Id.* at 268-269.

! The notices advised Plaintiff that two fire inspectors had not been properly registered to take a certification examination set to take place on March 13, 1999. Plaintiff does not dispute that he did not properly register two fire inspectors. He maintains that being unaware registration procedures had changed, he registered the investigators for the test the same way he had in the past and was given the impression by the companies he dealt with that the reservations were confirmed. *See Plf. Depo* at 113-118; 221-232, 241-254.

! Plaintiff was advised that he did not mail a copy of a form concerning a public relations event as requested in late March. He explained that although he put the public relations form in an envelope, he did not mail it before he left for vacation or ask someone else to do it for him because the event was not to occur for several weeks. While Plaintiff was out, the requestor again called asking for the copy and someone else had to mail it to him. *Id.* at 120-21.

! Plaintiff was advised that although he took a call from a citizen regarding a problem with an inspection, he failed to advise Ms. Clark of the situation or follow up on the matter. Later, the citizen eventually went to the office to rectify the situation, at which time Plaintiff located the paperwork in a closet. Plaintiff does not dispute that he took the call from the a citizen, that it was his responsibility to inform Captain Clark of such things, that

he failed to locate the paperwork initially, or that he finally found the paperwork in the closet after the citizen came down to the office.  Plaintiff's explanation for not locating the paperwork initially was that someone gave him the wrong name of the inspector, so he only looked for paperwork with that inspector's handwriting.  Therefore, his failure to find it was someone else's fault.  He did not think the closet was an inappropriate place for filing as that is where he kept his "to be filed" pile of unfiled documents.  *Id.* at 122-25.

!   Plaintiff was advised he did not complete all of the tasks Captain Clark requested that he do before leaving for vacation, yet he told her the tasks were completed before he left.  Robinson does not dispute that he failed to do all of the things on the list given him before his vacation or that he advised her they were complete.  He says only that her note did not make his earlier-approved vacation "contingent" upon him completing the tasks.  *Id.* at 128.

Plaintiff must show that a reasonable factfinder could rationally find that the proffered reasons are "unworthy of credence."  *Bullington v. United Air Lines, Inc.* 186 F.3d 1303, 1317 (10th Cir. 1999) (internal quotations omitted).  Mere conjecture is insufficient.  *Id.*  In addition, in "analyzing the pretext issue [federal courts] do not sit as 'super-personnel departments' free to second-guess the business judgment of an employer."  *Id.* at 1318, n.14 (internal quotation omitted).  The relevant inquiry is not whether terminating Plaintiff for these incidents was "wise, fair or correct," but whether the employer "honestly believed those reasons and acted in good faith on those beliefs."  *Id.* at 1318.  Furthermore, a "challenge of pretext requires us to look at the facts as they appear to the person making the decision to terminate plaintiff."  *Kendrick,* 220 F.3d at 1231.

The incidents cited as the basis for dismissal were objective and specific.  Because there is no dispute as to their occurrence,[3] Plaintiff's "explanations" alone are insufficient to create

---

[3]  I find the two remaining items in the notices that appear to be disputed are immaterial.  Plaintiff denies that he "provided false and inconsistent information and statement" when the registration problem was investigated on March 12, 1999.  *Id.* at 118.  He also denies failing to advise a captain that the PR event was scheduled, saying Ms. Clark told him she had already done so.  *Id.* at 120.

genuine dispute that the proffered reasons were pretext.  *See id.; see also Reeves v. Sanderson Plumbing Prods., Inc.,* 120 S. Ct. 2097, 2109 (2000) ("a prima facie case, *combined with sufficient evidence to find that the employer's asserted justification is false,* may permit the trier of fact to conclude that the employer unlawfully discriminated") (emphasis added).

A second route by which Plaintiff can show pretext is "by providing evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness."  *Kendrick,* 220 F.3d at 1230.  Plaintiff merely asserts that "other people had made more serious mistakes" and were not fired.  *Plf. Depo* at 129; *see also Doc. 33* at 10.  Without elaboration or supporting evidence, he claims in conclusory fashion in his deposition that fire inspectors who failed to carry out inspections were not fired.  *Plf. Depo.* at 129.  I find no basis in the record to conclude fire inspectors are similarly situated with administrative assistants.  "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline."  *Aramburu v. The Boeing Co.,* 112 F.3d 1398, 1404 (10th Cir. 1997) (internal citations and quotations omitted).

Likewise, without any supporting evidence or embellishment, Robinson claims in his deposition that a coworker lost time cards and was not fired.  Misplacing paperwork is hardly comparable to failing to carry out, or reluctantly carrying out, responsibilities specifically assigned by a supervisor.  *See Kendrick,* 220 F.3d at 1232-33.  Indeed, Plaintiff's failure to properly register two fire inspectors for an exam potentially compromised their certification.  *See Exh. C.* Thus, I find that Plaintiff has not demonstrated that these alleged incidents are either similar or comparable.

"[E]vidence that the defendant acted contrary to an unwritten policy or contrary to company practice" may also be used to demonstrate pretext. *Kendrick,* 220 F.3d at 1230. Robinson advances his employer's failure to follow the Labor Management Agreement requirement of "progressive discipline"as evidence of pretext. The Agreement, however, speaks only of levels of corrective action . *See Exh. K* at 19-20. Moreover, dismissal is expressly authorized "when the employee has engaged in egregious behavior that the County determines unacceptable for its employees." *Id.* at 20. I cannot say that repeated instances of failing to accomplish important job duties, insubordination and hostility towards coworkers would fall outside that category of behavior.

Plaintiff's final unsupported assertions of pretext for a discriminatory motive are mere conjecture: for example, he could "never appease" Dianne Brown, when he "tried to talk to her, she was not very interested, blew me off, unconcerned," *Plf. Depo* at 130, and the secretaries did not like him, *Doc. 33* at 11. Throughout his deposition, Robinson complained of treatment by coworkers: the women administrative assistants had a "clique" that regarded him as a "snob" who wore "designer clothes" and "had a decent car," but who "wasn't supposed to have that," *Plf. Depo.* at 85; he was the only person on the support staff level with a degree from the Anderson School of Management, *id.* at 102, *Doc. 33, Exh. D*; a coworker periodically would knock a picture Plaintiff had hanging on his wall, stole his engraved pen, and gave supplies he had ordered to someone else, *Plf. Depo.* at 102-06, 131-32, 138. He expressed his subjective belief that coworkers treated him without the respect he felt he deserved as a "Black, well-educated man." *Id.* at 143. Plaintiff's subjective belief is purely conjectural, however. Accordingly,

Defendants are entitled to summary judgment on Plaintiff's claims of gender and race

discrimination under Title VII,  § 1983, and § 1981.[4]

### § 1983 Claim For City Manager Failing To Consider Late Grievance

Plaintiff asserts that County Manager Vigil, did not allow him to file a late grievance based

upon Robinson's race.  Vigil is not a party to this action, and there are no allegations that either

Vinke or Brown had any part in that decision.  Apparently, Plaintiff seeks to hold the Board

responsible for Vigil's decision.

Section 1983 does not permit recovery based on *respondeat superior. See Monell v. New*

*York City Dept. of Social Services*, 436 U.S. 658, 691 (1978).  To hold the Board liable, Plaintiff

must show an illegal policy or custom caused the constitutional deprivation.  *Id.*  Yet, Plaintiff

points to no statutory or contractual authority granting him the right to file a late grievance.  He

offers no evidence whatsoever that identifies a policy or custom of the County permitting and

considering untimely grievances.  In his deposition Plaintiff surmised that the County has an

implied contractual obligation to bargain in "good faith," *Plf. Depo.* at 201, but as noted above,

he is not bringing any claim of breach against the County.  I agree with Defendants that the

undisputed facts establish that actions of the Union by failing to timely preserve his right to grieve

the termination caused any alleged deprivation.  *See Doc. 32* at 21.

To the extent Plaintiff contends that Vigil qualifies as the "final policymaker," he refers to

the decision to terminate, not to the decision concerning subsequent grievance proceedings.  *See*

*Doc. 33* at 12-13.  Moreover, Plaintiff points to no direct or indirect evidence tending to show

---

[4]  Because Defendants are entitled to summary judgment, it is unnecessary to address
Defendants' claims of qualified immunity and lack of "policy/custom" under § 1983 insofar as it
relates to the decision to fire Plaintiff.

that Vigil's decision to not allow a late grievance was based on race.  All of the evidence Plaintiff relies upon to show pretext concerns the decision to terminate itself and for the reasons above, he fails to sustain his burden.  Accordingly, Defendants are entitled to summary judgment on this aspect of Plaintiff's § 1983 claim.

### Section 1985(3)

"The essential elements of a § 1985(3) claim are: (1) a conspiracy; (2) to deprive plaintiff of equal protection or equal privileges and immunities; (3) an act in furtherance of the conspiracy; and (4) an injury or deprivation resulting therefrom." *Tilton v. Richardson,* 6 F.3d 683, 686 (10th Cir. 1993), *cert. denied,* 510 U.S. 1093 (1994).  The record is utterly devoid of any factual support for Plaintiff's § 1985(3) claim.  Simply referring to conclusory allegations in his complaint and affidavit is insufficient to defeat the motion.  *See Doc. 33* at 15 ("sequence of events" leading to his dismissal "could allow a jury to infer from the circumstances that the individual defendants and other members of the department, . . . had a meeting of the minds").  Plaintiff failed to produce any evidence of a racially-based motivation on the part of the County Defendants. "[Section] 1985(3) does not 'apply to all tortuous, conspiratorial interferences with the rights of others,' but rather, only to conspiracies motivated by 'some *racial*, or perhaps otherwise class-based, invidiously discriminatory animus.'"  *Id.* (quoting *Griffin v. Breckenridge,* 403 U.S. 88, 101-102 (1971)) (emphasis added).

Likewise, Plaintiff's passing mention of the former Union Defendants in his memorandum in opposition does not save this claim.  He states "the testimony was about a conspiracy between the County and the Union."  *Doc. 33* at 15, 17.  Plaintiff apparently is trying to argue that because the union representative failed to file a timely grievance of his termination and because Vigil

15

would not consider a late grievance, there was a conspiracy based on his race.  However, Plaintiff's complaint specifically exempted the Union Defendants as conspirators, a fact which notes that in bold in his memorandum in opposition.  *Id.* at 15.  Assuming he is trying to make a conspiracy claim against the County and the nonparty Union Defendants, the claim is based on nothing more than conjecture of an "agreement" and no evidence of racial motivation.

Finally, I am as baffled as Defendants at Plaintiff's suggestion that he does not yet have sufficient evidence of a conspiracy because the "Rule 16 conference was just held." *Doc. 33* at 16.  In fact, the initial Rule 16 conference was held almost one year ago on June 16, 2000.  This action was filed in April 2000 and discovery closed in February 2001.  *See Docs. 1, 14.*  Plaintiff has been provided ample time in which to develop evidence in support of his conspiracy claim.  Accordingly, Defendants are entitled to summary judgment on Plaintiff's § 1983(3) claim.

### *Retaliation Claim*

"Both Title VII and § 1981 support a cause of action for retaliation and require a plaintiff to establish the same *prima facie* elements to recover." *O'Neal v. Ferguson Const. Co.,* 237 F.3d 1248, 1258 (10th Cir. 2001).  To establish a *prima facie* case of retaliation, Plaintiff must show: (1) he engaged in protected opposition to discrimination; (2) he suffered an adverse employment action; and (3) a causal connection between the protected activity and the adverse employment action. *See Kendrick,* 220 F.3d at 1234.  As with the race and gender discrimination claims, Plaintiff has brought forth no direct evidence of an unlawful motivation.  Nevertheless,

> [a] causal connection may be shown by "evidence of circumstances
> that  justify an inference of retaliatory motive, such as protected
> conduct closely followed by adverse action." *Burrus v. United Tel.
> Co. of Kan., Inc.,* 683 F.2d 339, 343 (10th Cir. 1982).  Unless there
> is very close temporal proximity between the protected activity and

the retaliatory conduct, the plaintiff must offer additional evidence
to establish causation.  *See Conner v. Schnuck Mkts., Inc.,* 121 F.3d
1390, 1395 (10th Cir. 1997).  "***[W]e have held that a one and
one-half month period between protected activity and adverse
action may, by itself, establish causation.*** By contrast, we have
held that a three-month period, standing alone, is insufficient to
establish causation."  *Anderson v. Coors Brewing Co.,* 181 F.3d
1171, 1179 (10th Cir. 1999) (citation omitted).  Because O'Neal
presented additional evidence from which a reasonable jury could
find causation, this court need not address whether two months and
three weeks, by itself, is sufficient to support a *prima facie* case of
retaliation.

*O'Neal,* 237 F.3d at 1253 (emphasis added); *see also Clark County Sch. Dist. v. Breeden,* ___

S. Ct.  ___, 2001 WL 402573 (4/23/01) (citing *O'Neal*).  I find that Plaintiff has failed to come

forward with sufficient circumstantial evidence of a causal connection.

Plaintiff contends that until he complained about discrimination from his coworkers, there

were no complaints about his work performance.  It is undisputed, however, that in March 1998,

Ms. Clark told Plaintiff was spending too much time in the "administrative" area where the

women worked, and she asked Plaintiff to only go over there for business-related reasons.  *Plf's.*

*Depo.* at 77.  Although Plaintiff thought the accusation unfair, the incident does represent a

concern regarding his job performance prior him making any complaints.

"Informal complaints to superiors constitute protected activity."  *O'Neal,* 237 F.3d at

1255.  In an October 9, 1998 memorandum to supervisor Brown,[5] Robinson complained

> I am being subject to numerous acts of harassment and
> disrespect. . . . because I do not exhibit the same demographics or
> characteristics as that of my fellow clerical counterparts. . . .
> [Certain female coworkers] have an interpersonal conflict with

---

[5]  The memorandum indicated that copies were also being provided to Interim Fire Chief
Jim Tuma, Interim Assistant Fire Chief Glenn Vinke, Fire Marshall Bett Clark, and two of
Robinson's fellow clerical employees.

Wendell Robinson (or any man) who displays or exhibits a strong male identity, educational successes, a self-confident demeanor, and high income producing ability. ***I will not apologize for being a well-educated, young, African American male, with high standards, values and work ethics.***

*Def's Exh. D* (emphasis in original). Viewing this document in the light most favorable to Plaintiff, the above excerpt from the memorandum could constitute a protected complaint of employment discrimination.

Robinson testified at his deposition that he also complained on two other occasions:

Q:    What other documents did you prepare?
A:    I think there is one in January of '99 that I can remember the date specifically.
Q:    And who was that to?
A:    That was given to Chief Vinke.
Q:    Any other written complaints regarding harassment that you prepared?
A:    Yeah. There was at least one more or so.
Q:    And when was it made?
A:    Without it in front of me, I couldn't tell you.
Q:    Okay. Do you recall if it was during the time you were going to be terminated, or before?
A:    Prior to.
Q:    Okay. When you said this one was in October of 1998, the one that we have marked as Exhibit D, you said there was one in January of 1999. Do you remember if it came after, the one that you can't remember if it came after the January 1999 memo?
A:    I would say it came after this one and probably before the other one.
Q:    Okay. So sometime between October and January there was a third memo?
A:    Right.

*See id.* at 138-41. In this case, proof of the later complaints is essential to satisfy Plaintiff's obligation to make the *prima facie* showing. To create an inference of retaliatory motive for the termination necessarily requires Plaintiff to show a close temporal proximity between the time that he engaged in protected activity and the date of adverse employment action. Because the first

18

arguable adverse action – a notice of suspension – occurred in February 1999, the October

memorandum is too far removed to support an inference of retaliatory motive for his termination

in April 1999.

Yet, other than this rather vague testimony, Plaintiff has come forward with no further

evidence of complaints of discrimination after October 1998.  The asserted later written

complaints referred to by Robinson have not been submitted.  Plaintiff offers no explanation for

failing to offer them in opposition to the motion although he specifically testified that he retained a

copy of the October 9th memorandum in his "own personal file at home."  *Id.* at 140.  Therefore, I

am left with only Robinson's self-serving characterization that any later written memorandum

constituted protected activity.

"While the burden is 'not onerous,' it is also not empty or perfunctory.   Plaintiff's

evidence must be such that, if the trier of fact finds it credible, and the employer remains silent,

the plaintiff would be entitled to judgment as a matter of law." *Butler v. City of Prairie Village*,

172 F.3d 736, 747-48 (10th Cir. 1999), quoting *Texas Dept. of Community Affairs v. Burdine*,

450 U.S. 248, 253-54 (1981).  In a recent unpublished decision, the Tenth Circuit noted that not

all internal complaints to management qualify as "protected activities."   After noting that under

some circumstances, even informal complaints to management can constitute protected

participation under Title VII.  The court

> decline[d], however, to extend the Title VII and ADEA
> participation clauses to include generalized and cursory complaints,
> unsupported by specific factual allegations, to an employer when
> those cursory complaints are neither related to, nor would
> reasonably lead to a proceeding provided for by statute.

*Shinwari v. Raytheon Aircraft Co.*, 215 F.3d 1337, 2000 WL 731782 at *5 (10th Cir.), *cert. denied*, 121 S. Ct. 843 (2001) (unpublished & attached).  In the present case, Plaintiff has failed to show that the purported post-October complaints set forth any specific factual allegations, much less those which would reasonable lead to a proceeding under Title VII.  Having failed to establish a *prima facie* case of retaliation, Defendants are entitled to judgment as a matter of law.

Wherefore,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment is **granted**, and a judgment consistent with FED. R. CIV. P. 58 shall be entered.

**IT IS FURTHER ORDERED** that the pretrial conference set for Tuesday, May 29, 2001 at 2:00 p.m. and the trial set for Monday, July 16, 2001 at 9:00 a.m. are hereby **vacated.**

_____
UNITED STATES MAGISTRATE JUDGE
Presiding By Consent

20

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

215 F.3d 1337 (Table)
2000 CJ C.A.R. 3299
**Unpublished Disposition**
**(Cite as: 215 F.3d 1337,  2000 WL 731782 (10th Cir.(Kan.)))**

NOTICE:     THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA10 Rule 36.3 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Tenth Circuit.

Mohammad M. SHINWARI, Plaintiff-Appellant,
v.
RAYTHEON AIRCRAFT COMPANY, Defendant-Appellee.

No. 98-3324.

June 8, 2000.

Before BRORBY, PORFILIO and LUCERO, Circuit Judges.

ORDER AND JUDGMENT  [FN*]

FN* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir.R. 36.3.

LUCERO.

**\*1**  This employment case involves the termination of an aircraft engineer, allegedly in retaliation for activity protected by Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-3(a), and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(d). Appellant Mohammad Munir Shinwari appeals the district court's grant of summary judgment in favor of his former employer, defendant Raytheon Aircraft Company. This case requires us to examine the activities protected by the participation and opposition clauses of the anti- retaliation provisions of those statutes. Additionally, it requires us to consider, as in so many employment discrimination cases, the sufficiency of plaintiff's evidence of pretext in the employer's non-discriminatory reason for taking adverse action. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and affirm.

I

Plaintiff Shinwari is a "caucasian" male of Pakistani national origin. He was approximately fifty years old at the time of the relevant events. He was hired as a Senior Engineer by defendant Raytheon in early 1994, at a somewhat lower salary than the mid-point for engineers of his job grade. After first coming to Raytheon, Shinwari worked with Richard Gaines, who was involved in the decision to hire him, for between six months and one year. Shinwari received three annual performance review ratings--1994 (from Gaines), 1995, and 1996--of overall "fully competent." (II Appellant's App. Tabs 3, 5, 7; III Appellant's App., Gaines Dep. at 14-15.)

In late 1995, Shinwari was transferred to a new aircraft program, the "Hawker Horizon" program, based on his qualifications and a recommendation from Gaines. (III Appellant's App., Arnold Dep. at 1-3, 21-23.) The Hawker Horizon group was directed by Sam Bruner, and Shinwari reported to Bruner's subordinate, Eddy Arnold, from November 1995 through mid-1996.

In June 1996, Gaines was transferred into the Hawker Horizon program and some time thereafter again became Shinwari's supervisor.

Raytheon presented evidence of several alleged objective errors in Shinwari's work. Gaines described one incident wherein Shinwari selected a non-standard part for an admittedly minor detail in a proposed engineering drawing, and then refused to change the proposal after Gaines instructed him to use a more common part. Another incident involved alleged calculation errors by Shinwari, during early 1996, regarding an ice protection system. Derek Rounds, an engineer who had come from England along with the Hawker aircraft program, found errors, including inaccurate assumptions, in Shinwari's calculations; Gaines's evaluation confirmed the inaccuracies. According to Gaines, Shinwari denied making errors. Shinwari in his deposition continued to maintain there were no errors in the calculations and claimed that another employee, Ted Seely, agreed that there were no problems. The record contains no affidavit or deposition testimony by Seely.

Arnold, Shinwari's supervisor in the Hawker program, gave him an overall "fully competent" rating in his September 1996 annual performance review, noting, however, that Shinwari had difficulty accepting criticism and needed to exercise greater care in reducing errors. Arnold stated that he added the comment regarding error reduction at the behest of Bruner.

**2** Shinwari was dissatisfied with this review and complained, in late September 1996, to Nita Long, Raytheon's Director of Personnel Relations in Employment, alleging the review was inaccurate and discriminatory, but not alleging specific instances of discrimination. Long was in charge of Equal Employment Opportunity ("EEO") programs for Raytheon.

Around this time, Gaines and Shinwari began having increased difficulty with one another, with Gaines complaining to Arnold of Shinwari's "arrogant incompetence," (III Appellant's App.,

Arnold Dep. at 54-55,) and Shinwari protesting the appointment of Gaines as lead supervisor of their engineering team without his (Shinwari's) prior notification.

The situation apparently worsened in October of 1996, after Gaines become Shinwari's immediate supervisor. Raytheon employees describe at least two incidents of errors or inappropriate conduct by Shinwari during this period. In one, Shinwari sent a memorandum to senior managers describing how one aircraft system should be configured, without sending it to his immediate supervisors, Gaines and Art Kavie. According to Kavie, this led the managers to conclude, erroneously, that the memorandum contained the views of his entire group, rather than Shinwari's proposals, which were directly contrary to Gaines's instructions to him.

Another October 1996 incident involved a proposed specification to be sent to suppliers regarding a pressurization control system. According to Gaines, Shinwari's work on this project was patently deficient, yet Shinwari refused to revise it at his request. Shinwari denies that his work product was in any way incorrect.

Following the September 1996 performance review and these incidents, Long and Shinwari met on October 23, 1996. Shinwari stated in his deposition that "I told Nita Long that the performance review that I have gotten are biased, and I see quite a bit of discrimination." (III Appellant's App., Shinwari Dep. at 468.) He does not indicate whether he alleged the basis-- age, national origin, or otherwise--of this perceived discrimination. Long denies that Shinwari made any allegation of age or national origin discrimination at their meeting.

At the request of both Shinwari and his supervisors, Long set up meetings between them to attempt to resolve the conflict. Shinwari states that on November 15, 1996, at one such meeting with Long, Arnold, and Bruner, he complained, verbally, of "bias and discrimination," in protesting his performance evaluation. (III

Appellant's App., Shinwari Dep. at 611.) [FN1] At the second of the two meetings later that same day, Shinwari's supervisors issued him a "special" performance review rating him unsatisfactory in almost all categories. Shinwari refused to sign the review and responded that the review was unjustified and based on discrimination as well as in retaliation for his opposition to the September review and alleged earlier complaints of discrimination. After the meeting, conflict between Shinwari and Gaines continued.

> FN1. Shinwari, in his deposition, did not specify the type of discrimination to which he referred.

**\*\*3** At a November 27, 1996, meeting, Shinwari responded in writing to his special performance review, disagreeing with all the particulars. He also attached a note to Long's copy of this memorandum, stating that "I believe that the Special Review was done in retaliation for my having met with you and raised complaints," and specifying that he had begun to believe the review was motivated by age and national origin discrimination, although he "[did] not have any proof." (II Appellant's App. at 15.) According to Long, she did not show this attachment to anyone, nor investigate further Shinwari's allegations, because it was clear to her he was simply "looking for a way around the fact that his performance was unsatisfactory." (III Appellant's App., Long Dep. at 344.)

Problems in Shinwari's work continued, including, according to Gaines, handwritten and poor-quality work, and failure to take direction. In December 1996, Shinwari received a comparatively small merit pay increase; on January 13, 1997, he e-mailed Long with further complaints, stating that "I strongly believe that I am, on a regular basis, discriminated against, because of my age and other background." (II Appellant's App. at 23.)

In mid-January, after Shinwari's supervisors informed Long that problems with Shinwari

continued and they wanted him transferred, no other supervisors were willing to accept him. On or around January 17, Art Kavie, director of the Hawker design group, decided to terminate Shinwari, with the approval of Bruner. Raytheon offered him the choice of resignation or involuntary termination. Shinwari chose the latter, complained to the EEOC, and eventually sued, alleging age and national origin discrimination and retaliation. Prior to summary judgment, he dropped the discrimination claims, leaving only his retaliation claims for resolution by the court.

The district court granted summary judgment in favor of Raytheon on both of Shinwari's retaliation claims. As for the ADEA retaliation claims, it found no prima facie case of retaliation because Shinwari lacked a reasonable belief age discrimination had occurred, and that even if he made a prima facie case, he failed to rebut Raytheon's neutral reasons for termination. On the Title VII retaliation claims, the court found an absence of pretext evidence and granted summary judgment to Raytheon on that ground.

## II

Considering this appeal from an award of summary judgment, we employ our customary standard of review:

> We review a grant of a motion for summary judgment de novo, applying the same legal standard used by the district court. *See Byers v. City of Albuquerque,* 150 F.3d 1271, 1274 (10th Cir.1998). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.Pro. 56(c). We view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmoving party. *See Byers,* 150 F.3d at 1274.

**\*\*4** *McGarry v. Board of County Comm'rs,* 175 F.3d 1193, 1198 (10th Cir.1999).

Both Title VII and the ADEA, in similar language, make it unlawful to retaliate against an employee for engaging in certain protected activities. *See* 42 U.S.C. § 2000e-3(a) (Title VII); 29 U.S.C. § 623(d) (ADEA).

"Title VII retaliation claims generally proceed under the *McDonnell Douglas* burden-shifting analysis." *McGarry,* 175 F .3d at 1201 (citing *Sauers v. Salt Lake County,* 1 F.3d 1122, 1128 (10th Cir.1993)); *see also McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). The same standard applies to ADEA retaliation claims. *See Anderson v. Phillips Petroleum Co.,* 861 F.2d 631, 634 (10th Cir.1988); *see also Hazen Paper Co. v. Biggins,* 507 U.S. 604 (1993) (clarifying the showing of intent required to prove discrimination). The familiar *McDonnell Douglas* framework consists of plaintiff's prima facie case, defendant's neutral reason for its action, and plaintiff's rebuttal of the neutral reason by means of pretext evidence. *See, e.g., Butler v. City of Prairie Village,* 172 F.3d 736, 747-48 (10th Cir.1999). We therefore examine in turn each aspect of this analysis of circumstantial evidence of retaliatory motive.

A. Prima Facie Case

The district court found Shinwari had failed to establish a prima facie case of retaliation under the ADEA, although it found Raytheon had failed to carry its summary judgment burden as to Shinwari's prima facie case of Title VII national origin retaliation. To establish a prima facie case of retaliation under either statute, a plaintiff "must show: (1) that he engaged in protected opposition to discrimination; (2) adverse action by [defendant] subject to the protected activity; and (3) a causal connection between [plaintiff's] protected opposition and the adverse action." *McGarry,* 175 F.3d at 1201 (citing *Griffith v. Colorado,* 17 F.3d 1323, 1331 (10th Cir.1994); *Archuleta v. Colorado Dep't of Insts.,* 936 F.2d 483, 486 (10th Cir.1991)).

1. Protected opposition

a. Participation

Title VII establishes two categories of protected activity: participation and opposition. *See* 42 U.S.C. § 2000e-3(a) (prohibiting retaliation because an employee "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter"). Because the retaliation provision of the ADEA, 29 U.S.C. § 623(d), is identical in all material respects to the retaliation provision of Title VII, 42 U.S.C. § 2000e-3(a), we readily discern congressional intent to approach the two provisions in an identical manner. *See* 8 Lex K. Larson, Employment Discrimination, § 129.01, at 129-1 to 129-2 & n. 2 (2d ed.1999).

The participation clauses prohibit an employer from retaliating "against an employee or applicant for employment because she 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Brower v. Runyon,* 178 F.3d 1002, 1005 (8th Cir.1999) (quoting 42 U.S.C. § 2000e-3(a)) (emphasis omitted). "Conduct is only protected, however, if it qualifies as participation 'in any manner' in a Title VII 'investigation, proceeding, or hearing.' " *Id.* (quoting 42 U.S.C. § 2000e-3(a)). "The participation clause is designed to ensure that Title VII protections are not undermined by retaliation against employees who use the Title VII process to protect their rights." *Id.* at 1006 (citing *Hashimoto v. Dalton,* 118 F.3d 671, 680 (9th Cir.1997)). Because of this purpose, "[a] plaintiff may maintain an action for retaliation based on participation in a protected proceeding regardless of whether the conduct forming the basis of her underlying complaint is adjudged to violate Title VII." *Jeffries v. Kansas,* 147 F.3d 1220, 1231 (10th Cir.1998) (citing *Archuleta,* 936 F.2d at 487; *Wyatt v. City of Boston,* 35 F.3d 13, 15 (1st Cir.1994)). As noted above, the same analysis applies with respect to claims

under the anti-retaliation clauses of the ADEA, 29 U.S.C. § 623(d).

**\*\*5** Shinwari argues that his internal complaints within the company are protected under the participation prong of the retaliation provision. This argument is without merit. Complaints to management, even informally, can under some circumstances be sufficient to invoke the participation clause. *See Jeffries,* 147 F.3d at 1231 & n. 9. The facts of this case, however, fall far short of those in *Jeffries.* There, the plaintiff delivered a letter to the superintendent of her employer hospital describing acts of sexual harassment, a letter the hospital treated as a formal complaint and assigned EEO representatives to address. *See id.* at 1226. Here, Shinwari's allegations of discrimination were simply conclusory statements offered against his own performance review, without sufficient detail for the company or the EEOC to know what to investigate. The Eighth Circuit has held that

> [n]ot all discussions with individuals who are part of the Title VII grievance process or all informal complaints will amount to participation in a Title VII proceeding, however. At a minimum there would have to be factual allegations of discrimination against a member of a protected group and the beginning of a proceeding or investigation under Title VII.

*Brower,* 178 F.3d at 1006 (citing *Ghane v. West,* 148 F.3d 979, 982 (8th Cir.1998)). We reject the contention that the fact that no investigation ensued will always automatically defeat application of the participation clause, because serious problems would undoubtedly arise if an EEO counselor declined to investigate claims that, unlike Shinwari's, included specific factual allegations. We decline, however, to extend the Title VII and ADEA participation clauses to include generalized and cursory complaints, unsupported by specific factual allegations, to an employer when those cursory complaints are neither related to, nor would reasonably lead to a proceeding provided for by statute.

b. Opposition

"The [Title VII] retaliation provision also contains an 'opposition clause' which prohibits retaliation against an employee or applicant for employment because she 'opposed any practice made an unlawful employment practice by this subchapter.' " *Brower,* 178 F.3d at 1005 n. 3 (quoting 42 U.S.C. § 2000e- 3(a)). As previously noted, we apply a similar analysis to ADEA retaliation claims.

Because the record before us could support a conclusion that Shinwari engaged in opposition to alleged discrimination, but not that he participated in proceedings under the relevant statutes, he must therefore show that his opposition was to at least a perceived practice prohibited by either Title VII or the ADEA. We have held that "opposition activity is protected when it is based on a mistaken good faith belief that Title VII has been violated." *Love v. RE/MAX of Am., Inc.,* 738 F.2d 383, 385 (10th Cir.1984) (citations omitted).

The district court mischaracterized our standard when it stated that the belief that antidiscrimination law has been violated must not only be subjectively in good faith but objectively reasonable, citing Eleventh Circuit authority. *See Little v. United Techs.,* 103 F.3d 956, 960 (11th Cir.1997). However, our Circuit's standard requires only a subjectively good faith belief. *See Jeffries,* 147 F.3d at 1231; *Love,* 738 F.2d at 385; *see generally* 2 Larson, Employment Discrimination, § 34.03[2], at 34-36 to 34-41 and nn. 54-60 (noting that the First and Tenth Circuits have adopted a good faith belief test, by contrast to the Eleventh Circuit's reasonableness test, and only the Second and Seventh Circuits require both good faith and reasonableness). Under *Love,* 738 F.2d at 385, the only question in determining whether Shinwari's complaints of discrimination constituted protected opposition is whether those complaints were made in good faith.

**\*\*6** Raytheon offers considerable evidence of older and Pakistani employees being reviewed and paid well to rebut Shinwari's ultimately

25

abandoned discrimination claims, undermining the objective reasonableness of those claims. Shinwari points to several instances, however, apart from his own adverse evaluations and alleged under-compensation, which he maintains led him to develop a good faith belief in both age and national origin discrimination. These were:

(1) plaintiff's belief that his 1996 performance evaluation reflected bias toward older employees; (2) Arnold's comment about plaintiff's salary; (3) the fact that "there was one time" when Arnold did not let plaintiff, Seely or Davidson participate in a presentation to "very upper management;" (4) plaintiff's belief that Seely, Davidson, Ungezene and other unidentified over- 40 engineers had been demoted or relieved of leadership responsibilities; (5) the fact that Raytheon selected Gaines, rather than plaintiff, as lead engineer on the environmental control system team; and (6) a conversation where Seely told plaintiff that he was not happy with his performance evaluation.

(I Appellant's App. Doc. 3 at 22.)

Review of the record reveals that Shinwari's allegations of discrimination are generally vague, conclusory, and unsupported by specific factual instances. Nevertheless, there are claims which arguably could support a good-faith, albeit mistaken, belief that Raytheon was engaged in age discrimination. Specifically, he points to responsibility being taken away from a fifty-seven- year-old employee, Ted Seely, and to one instance when Arnold announced he was going to give the opportunity to make a presentation to "the younger leads." (III Appellant's App., Shinwari Dep. at 445.) Although Raytheon points to facts indicating that these instances were not discriminatory, its arguments are not so patently obvious as to persuade us that no reasonable fact-finder could consider Shinwari's alleged belief to have been in good faith. We note, however, that all Shinwari's cited instances pertain to alleged age, and not national origin, discrimination. The district court nevertheless found in favor of Shinwari as to protected activity under Title VII, based on Raytheon's failure to address facts

specific to his Title VII retaliation claim. Because Raytheon's Title VII argument on appeal is likewise restricted to the issue of pretext, and because we agree with the district court on the dispositive question of pretext, we do not disturb the lower court's conclusion that Raytheon failed to carry its burden as summary judgment movant on this point.

2. Adverse Action

Raytheon concedes that Shinwari's termination qualifies as an adverse action for the purposes of establishing a prima facie case of unlawful retaliation.

3. Causation

To develop a prima facie case of retaliation, a plaintiff must show not only protected activity and adverse action, but also a causal relationship between the two. "The requisite causal connection may be shown by producing 'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.' " *McGarry,* 175 F.3d at 1201 (quoting *Burrus v. United Tel. Co. of Kan.,* 683 F.2d 339, 343 (10th Cir.1982)). "Unless the termination is very closely connected in time to the protected conduct, the plaintiff will need to rely on additional evidence beyond mere temporal proximity to establish causation." *Conner v. Schnuck Markets, Inc.,* 121 F.3d 1390, 1395 (10th Cir.1997). The district court properly found sufficient temporal proximity to establish an inference of causation, but found that inference refuted by of lack of evidence of knowledge of Shinwari's complaint by the relevant decision-makers. While it is apparent that protected activity cannot bear a causal relationship to adverse action if those taking the action were unaware of the existence of the protected action, we disagree with the district court's conclusion that the summary judgment materials cannot support an inference of such awareness.

**\*\*7** The district court's conclusion that Raytheon had refuted causation, in the context Shinwari's ADEA claim, by showing a lack of knowledge on the part of the relevant decision-makers relied in part on deponent Bruner's retraction of his deposition testimony in a correction, as noted in the district court's order at 17 n. 19. During his deposition, Bruner stated that "[a]t some point in time we received a document from Mohammad stating that he had been--he felt he had been discriminated against." (III Appellant's App., Bruner Dep. at 135.) At that point, Shinwari's counsel handed Bruner a copy of Shinwari's January 13, 1997, e-mail to Long, which alleged "I strongly believe that I am ... discriminated against, because of my age and other background." (II Appellant's App. at 22-23). Bruner stated that "[y]es, this is the one I am talking about," and explained that he probably discussed it with Kavie, Gaines, and Arnold. (III Appellant's App., Bruner Dep. at 135.) When asked "when that conversation took place," he responded "probably ... the day this came out, because this is the sort of thing that would probably generate some response among the recipients." (*Id.* at 136.) When asked how he got a document addressed only to Long, he replied "[m]aybe Nita gave me a copy, I don't know, but I got a copy." (*Id.*) This deposition testimony, viewed in the light most favorable to Shinwari, supports an inference that Bruner received the note from Long--and discussed it with Gaines, Kavie, and Arnold--around January 13, 1997, although Long denies having given it to anyone until the EEOC investigation.

 In his deposition corrections, Bruner changed the answer to the question regarding when he saw the January 13, 1997, e-mail to Long to read "[w]e had that conversation during the time we were preparing for the interviews with the EEOC investigator." (I Appellee's Supp.App. at 161.) The district court relied on this correction to conclude that no one other than Long--i.e. no decision- makers with respect to Shinwari--saw the January 13, 1997, e-mail until after Shinwari's termination.

Shinwari argues, however, that Fed R.Civ.P. 30(e), permitting deposition corrections, does not render previous testimony inadmissible, citing *Podell v. Citicorp Diners Club, Inc.,* 112 F .3d 98, 103 (2d Cir.1997). This is the appropriate rule, particularly when a deponent attempts to use correction to eliminate a substantively harmful statement, rather than to correct problems such as transcription errors. Under such circumstances, "[t]he original answer to the deposition questions will remain part of the record and can be read at the trial." *Id.* (citations omitted). The possibility of impeachment of Bruner with his original testimony, therefore, would appear to create at least a dispute of material fact as to knowledge of the January 13 e-mail on the part of Bruner, and--viewing the evidence in the light most favorable to Shinwari-- Gaines, Kavie, and Arnold as well.

 **\*\*8** The January 13, 1997, e-mail, refers clearly to alleged age discrimination, but also mentions discrimination because of Shinwari's "other background." (II Appellant's App. at 23.) As to Shinwari's November 27, 1996, note to Long, specifically mentioning national origin discrimination, Long denies its circulation to anyone else prior to Shinwari's termination. Bruner's testimony is that he cannot recall when he first saw that document, that is, "whether [it] was before or after Mr. Shinwari's termination." (III Appellant's App., Bruner Dep. at 137.) Additionally, although Shinwari's deposition testimony is vague on the point, it creates a factual dispute as to whether he made oral allegations of some type of discrimination at the November 15, 1996, meeting with Long, Arnold, and Bruner. Viewing all this evidence in the light most favorable to Shinwari, we conclude it could support an inference of knowledge and therefore causation as to claims of both age and national origin discrimination.

 Therefore, we conclude that "for purposes of summary judgment, the[ ] evidence and the reasonable inferences drawn therefrom, together with the close temporal relationship" between Shinwari's complaints of discrimination and his termination, "demonstrate that [Shinwari] has met

his burden of establishing a prima facie case of retaliation." *McGarry*, 175 F.3d at 1201 (citing *Candelaria v. EG & G Energy Measurements, Inc.*, 33 F.3d 1259, 1261-62 (10th Cir.1994)).

B. Defendant's Neutral Reason

"As with discrimination claims, once the plaintiff has established a prima facie case of retaliation, the employer has the burden of coming forth with a legitimate, nondiscriminatory reason for its adverse action." *Butler*, 172 F.3d at 752 (citing *Sauers*, 1 F.3d at 1128). Once Shinwari established his prima facie case of retaliation, the burden shifted to Raytheon to show a legitimate reason for his termination. *See McGarry*, 175 F.3d at 1201. Raytheon has met this burden. Although Shinwari raises factual disputes over specifics, given the nature of the employer's burden at this stage, there is enough uncontroverted evidence of perceived deficient performance to require pretext evidence.

C. Pretext

Once the defendant presents evidence of a neutral reason, "even though a plaintiff has established a prima facie case, the defendant is entitled to summary judgment unless the plaintiff produces either direct evidence of discrimination or evidence that the defendant's proffered reason for the action taken was pretextual." *Conner*, 121 F.3d at 1397. Following presentation of evidence of the defendant's neutral reason, " 'the presumption of [impermissible motive] simply drops out of the picture,' " and the analysis shifts to the plaintiff's ultimate burden of showing that the defendant took action on an illegal basis--in this case, retaliation for protected activity. *Id.* at 1396 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510- 11 (1993)). The plaintiff may then resist summary judgment if she can present evidence that the proffered reason was pretextual, "i.e. unworthy of belief," *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir.1995), or "otherwise introduces direct evidence of illegal ... motive," *id.* at 453. "Effective cross-examination, combined with the plaintiff's initial evidence, may

be sufficient to effect this task." *Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1103 (10th Cir.1998) (citations omitted); *see also Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255 n. 10 (1981). "To avoid summary judgment, a plaintiff need not demonstrate that [impermissible] reasons motivated the employer's decision." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1321-22 (10th Cir.1997) (citation omitted). Rather, he or she must simply point to facts that could lead a reasonable jury to disbelieve the employer's proffered reason. *See Butler*, 172 F.3d at 750-51.

**\*\*9** Allegations of retaliation do not relieve a plaintiff of this burden, which can be met either by direct evidence of retaliatory motive or by showing that the employer's reasons were pretextual. *See Conner*, 121 F.3d at 1396- 97. Temporal proximity between protected activity and adverse action may combine with additional circumstantial evidence to create a fact issue as to pretext. *See Butler*, 172 F.3d at 752. This is not the case here, because Shinwari points to virtually no additional evidence, resting principally on his prima facie case. Shinwari's argument on this point was rejected in *Conner*, 121 F.3d at 1397-98. [FN2] As noted in the unpublished case of *Trujillo- Cummings v. Public Serv. Co.*, No. 97-2337, 1999 WL 169336, at \* \*3 (10th Cir. March 29, 1999):

> FN2. We recognize that our discussion of retaliation in *Marx v. Schnuck Markets, Inc.*, 76 F.3d 324, 329 (10th Cir.1996), which did not examine in detail the *McDonnell Douglas* framework, has led litigants to contend that case stands for the proposition that a prima facie case, in the retaliation context, necessarily also establishes pretext. However, the court in *Conner*, 121 F.3d at 1398, specifically rejected such a reading of *Marx*.

The fact that temporal proximity may support an inference of causation sufficient to establish a plaintiff's prima facie case does not automatically demonstrate that a defendant's

proffered justifications are pretextual. While a discharge is retaliatory if "the immediate cause or motivating factor of a discharge is the employee's assertion of statutory rights," *Martin v. Gingerbread House, Inc.,* 977 F.2d 1405, 1408 (10th Cir.1992) (citations and footnote omitted), appellant confuses the inference of causation sufficient to establish a prima facie case of [retaliation] with her ultimate burden of proving that the protected action was indeed the cause of the discharge. Once the employer meets the second step of *McDonnell Douglas,* the inference of causation drops out, and a plaintiff does not carry his or her burden until he or she offers some evidence of pretext in the employer's legitimate reason. *See Conner,* 121 F.3d at [1398] (refusing to read *Marx* as "holding that protected conduct closely followed by adverse action always justifies an inference of retaliatory motive, and thus summary judgment is always inappropriate when temporal proximity is established").

In his reply brief, Shinwari relies on *Butler* 's holding that, in certain cases, temporal proximity between protected activity and adverse action may be insufficient to create an inference of retaliatory motive, but with additional evidence may nevertheless create a fact issue as to pretext. *See Butler,* 172 F.3d at 752. He argues that *Butler* allows him to rest his pretext argument entirely on the temporal proximity evidence here *sufficient* to establish the causation prong of the prima facie case. In *Butler,* however, "additional circumstantial evidence," of pretext was present. *Id.* In that case, the proffered neutral justification for the plaintiff's termination was that his position was eliminated pursuant to a reorganization. Evidence of pretext included resurrection of the plaintiff's former duties in a new position and the fact that his was the only position eliminated while it was occupied. *See id.* These facts represented substantial circumstantial evidence of pretext, making temporal proximity merely an additional factor and not a complete substitute for pretext evidence. *See id.* Shinwari does not offer such evidence suggesting that his

adverse evaluations and termination were pretextual, apart from their temporal proximity to his alleged complaints. If this were enough, the burden-shifting scheme of *McDonnell Douglas* would be effectively eliminated in retaliation cases, and this Circuit has already rejected such an approach. *See Conner,* 121 F.3d at 1398.

**\*\*10** Shinwari's reliance, in his reply brief, on *McGarry,* 175 F.3d at 1200-02, is likewise misplaced. That case, like *Butler,* involved additional evidence of pretext apart from temporal proximity alone--notably the employer's failure to keep the plaintiff's application on file and reconsider it for a new opening following a specific promise to do so. *See id.* at 1202.

Shinwari contends that he did present "additional circumstantial evidence" of pretext, *Butler,* 172 F.3d at 752: namely, the sudden drop in his job evaluations and the credibility issue created by Bruner's subsequent retraction of deposition testimony. Although Shinwari's evaluations did drop precipitously between his September 1996 annual evaluation and his special performance review only a few months later, Raytheon cites to extensive and unrefuted record evidence supporting such a re-evaluation. Moreover, the comments on Shinwari's September 1996 regular review regarding errors and sensitivity to criticism reveal that Arnold and Bruner were aware that problems of careless work and difficulty in dealing with criticism were ongoing--problems that are consistent with those identified in the special performance review.

More importantly, Shinwari has produced no evidence that Raytheon's explanation of the underlying cause of the abrupt drop in performance evaluation lacks credibility. Indeed, while he maintains that there are factual disputes as to the errors and instances of insubordination at issue, review of the record reveals that the only dispute arises from Shinwari's subjective evaluations of his own performance. While Shinwari's deposition is replete with broad contentions such as one that anyone in the aircraft industry would confirm that he is one of the finest

engineers in that industry, such confirmation is conspicuously absent from the record--as is any affidavit or deposition testimony by anyone other than Shinwari himself confirming that his calculations were correct or his behavior acceptable. Highly generalized and self-serving evaluations of one's own performance are not sufficient to create a genuine issue of material fact as to the sincerity, as opposed to the correctness, of an employer's negative performance evaluation. *See, e.g., Fallis v. Kerr-McGee Corp.,* 944 F.2d 743, 747 (10th Cir.1991) (holding that "a plaintiff cannot prevail by merely challenging in general terms the accuracy of a performance evaluation which the employer relied on in making an employment decision without any additional evidence (over and above that of the prima facie case)" (citing *Branson v. Price River Coal Co.,* 853 F.2d 768, 772 (10th Cir.1988)).

The more difficult question, in our view, is whether Bruner's amendment of his deposition testimony regarding his receipt of Shinwari's January 13, 1997, e- mail alleging discrimination might suffice to call into question the sincerity of Raytheon's professed motive for terminating Shinwari. Viewing the evidence in the light most favorable to Shinwari, we conclude that cross-examination of Bruner as to the discrepancy between his initial statement and the later correction could lead to an inference that he was seeking to conceal his knowledge of Shinwari's complaint of discrimination. As discussed above, such an inference supports the causation element of Shinwari's prima facie case, but we are not persuaded that this fact alone suffices to carry the day on the question of pretext. Viewing the entirety of the evidence in context, we conclude that this single isolated inconsistency is not sufficient to undermine the sincerity of Raytheon's professed motive for taking adverse action, particularly as the inconsistency at issue is not immediately related to that professed motive, and does nothing to undermine the allegations of deficient performance by Shinwari's other supervisors, whose credibility is not similarly undermined. Such a view is bolstered by the fact

that not Bruner, but rather Kavie, participated in the initial decision to terminate Shinwari. In short, taking the facts in the light most favorable to Shinwari, even if Bruner was aware of Shinwari's January 13, 1997, e-mail but tried to conceal that awareness, in the context of the totality of the facts in the record before us, that single fact is not sufficiently material to the specific reasons proffered for Shinwari's termination to establish pretext without some additional evidence thereof.

**\*\*11** Shinwari relies on *Dey v. Colt Construction & Development Co.,* 28 F.3d 1446, 1460-61 (7th Cir.1994), for the proposition that this inconsistency constitutes sufficient evidence of pretext to prevent summary judgment. (*See* Appellant's Br. at 25.) In *Dey,* however, the court found evidence sufficient to support an inference of pretext based on specific refutations of particular instances of alleged misconduct, corroborated by the testimony of co-workers. *See id.* Here, Shinwari, unlike Dey, denies none of the incidents cited by Raytheon as grounds for his termination, but simply maintains, without corroboration, that he was in the right in each of them. The only "denials of knowledge of a complaint," (Appellant's Br. at 25,) at issue in the pretext analysis in *Dey* were denials by a supervisor that other employees had complained to him about alleged deficiencies in the plaintiff's performance, and therefore that case simply does not affect the separate issue of whether a manager's denial of receipt of a discrimination complaint--called into question by inconsistent deposition testimony--automatically suffices in and of itself as evidence of pretext in a retaliation case. The text of *Dey* cited by Shinwari, *see* 28 F.3d at 1459, deals with the distinct issue of the relevance of a disputed denial of receipt of a complaint to the question of whether an employer was *aware* of the protected activity. *See id.* at 1458-59. Therefore, we conclude that *Dey* is not applicable to the particular question before us.

While there certainly may be cases where a manager's rebutted denial of knowledge of an employee's complaint would be sufficient to

question the sincerity of the manager's professed motives for terminating the employee, *see Roberts,* 149 F.3d at 1103, this is not such a case. As we have often stated, the pretext inquiry is highly fact-specific. *See Conner,* 121 F.3d at 1398. Based on review of the summary judgment materials before us, we conclude that the evidence of Shinwari's deficient performance is so overwhelming and unrefuted that the single inconsistency in Bruner's deposition testimony cannot suffice to carry Shinwari's burden of showing pretext at the summary judgment stage.

### III

The judgment of the district court is AFFIRMED.

END OF DOCUMENT